Thank you, Your Honor. Good morning. May it please the Court, Gary Lowenthal representing Stephen Craig James, the petitioner appellant in this action. My co-counsel Thomas Phelan is with me at the council table, but I will present the entire argument this morning, Your Honors. I'd like to reserve five minutes if you'd like. Okay, count down and we'll try to help you keep track. Am I close enough to the mic to be heard clearly? Thank you. Our position, first, on the penalty phase IAC claim, is that the district court was clearly wrong in applying Strickland's prejudice prong to the facts of this case. And second, the relief we're requesting from this court on the penalty phase IAC claim is to reverse the district court, remand the case to state court for resentencing, granting the writ of habeas corpus. The crux of our argument on prejudice, just make a few brief points at the outset. First, we presented a large stack of mitigation exhibits to the district court, most of volume two of RER and a good portion of volume three of RER. Second, Terry Hillinger, a similar type of sentencing court. Third, Hillinger failed to prove a single mitigating factor in this case. And the fourth point in our prejudice argument is that on the other side of the scale between aggravation and mitigation, this is a death penalty or a death sentence that is supported by one and only one aggravating factor. Now, this is not an issue here, but the aggravating factor that remains was declared unconstitutionally vague in Maynard. Now, it's been saved by subsequent construction, but even the one aggravator in my mind, the one that remains, had had some problems. That's correct, Your Honor. That's not an issue before the court. That's right. I understand that. Do I understand correctly, Mr. Lowenthal, that this is a non-AEDPA case? Is that correct? That's correct. For example... Well, it's an AEDPA case, but it was the district court to decide the merits of it. That's correct, Judge Berzon. For purposes of 2254B or 2254E2, of course, AEDPA would apply. AEDPA would apply, but not with the diligent, excuse me, with the question of that came up, for example, in the Richter case, just... No, that's where it was my primary focus was, yes. Is it, with regard to the, what was before the state court at the time of the sentencing, it seems to me a key question here is what should be made of the pre-sentence report. I understand that Hill and Virginia presented, but at least the outlines of a lot of the case, the outlines is what I'm saying. And I wonder, I mean, including the drug use and some background information and so on, has anybody ever, you're not challenging the use of the PSR as such, right, even though it's not really, it wasn't presented in an adversary fashion. You seem to be agreeing that it could be the subject of a prejudice inquiry, it's relevant to the prejudice inquiry, or are you? Yes, I would agree with everything you've said, Your Honor. Enough challenging. You are not challenging it. You're agreeing that it's pertinent. But I would like to point out, in response to that, and it may take a few minutes to make this point, but I think it's critical to this case, and that is that the district court was dead wrong on saying that much of the information presented in the habeas exhibits was, quote, before the court in the pre-sentence report. And I think the judge, to be fair to Judge Wake, he also pointed to two pre-sentence competency reports and to the very, very scant testimony in the record of this combined hearing. But let me just quickly go through, if I can, what was not presented to the court to get a sense of the difference between, not just what Pillinger presented, but the scant information that was provided, as the case law says, snapshots from Mr. Wake's testimony. Before you do that, let me be sure that we're all on the same page on this. My impression is that because the district court denied an evidentiary hearing, what you have to show is a colorable claim. Is that the standard we're looking at here? Our position, yes and no, Your Honor. Our position is that we're asking this court to not only reverse the district court on the issue of a colorable claim, but also, on the basis of an extended record, to remand this case, to grant the writ, remand the case to the state court for re-sentencing. You're basically saying that you are not, although along the way you've asked for an evidentiary hearing as an alternative, that's not your preferred alternative, and you think we should support, as it is, a grant of relief. Yes, Your Honor. So you don't want an evidentiary hearing? As a fallback position, if you don't agree with us on the relief we're requesting, I'd like to address that question as well as Judge Berzon's question with regard to what wasn't before the court. I don't know which you want me to go to. It doesn't really matter. I think ultimately we need to know that, but I guess to me it would be very helpful before you marshal your evidence here to know in what form, if you agree, are we talking about sending it back, per your request, to the district court to hold an evidentiary hearing, to consider the new information in the proper forum, whether it's cross-examination and the like, and then the district court make the determination at that point whether the writ should be granted, or you're saying, grant the writ, send it back for a whole new penalty phase, forget the evidentiary hearing. That's your preferred position, I guess. Absolutely. We believe the latter position is our preferred position. We also believe that under the standard for a culpable claim, Mr. James is entitled to an evidentiary hearing. But let me – I'm sorry. I'm sorry. We may as well finish one thing before we go on to the next. And with regard to the evidentiary hearing, there's not any conflict in the evidence here. The State has not come back and said anything that you said isn't so. That's correct. So what would the evidentiary hearing be about? That's exactly our point, Your Honor. And that's one of the reasons why it would be correct for this court to order that the writ be granted and remand the case to the State Court. That's precisely one of our principal arguments. Now, I know you're going to get to this evidence, and we'll let you get there. Maybe you will. Maybe you won't. And we're not going to hold you to the 30 minutes if that's going to prevent you from getting to what you want to say on that point. But again, on this evidentiary hearing question, there were some discovery requests that were denied by the District Court. The one I'm particularly thinking about was the evidentiary – the discovery request for getting the child services in Los Angeles County and also court records in the Superior Court that may be relevant to Mr. James or perhaps to his mother. Now, with respect to that, obviously there's no dispute as to that evidence because we don't know what it is. We can guess at it, of course. And we know that the District Court, toward the end of the opinion – I think it's footnote 17 – says he assumes the, quote, veracity of that material. But, of course, he doesn't know what the material is. I think, Your Honor, he was assuming the veracity of the 80-plus exhibits that we actually presented to the court. Right. And he said, we don't need further evidentiary development, which referred to the discovery request with regards to Los Angeles County. But those discovery requests – some of the information that you had in discovery requests were after his decision on reconsideration. Yes. What about the California records? That was in his main decision, Your Honor. And you asked for that beforehand? We had already asked for that, yes. Mr. Lowenthal, I like what you're – it's pretty clear. You're asking us to basically make a judgment ourself of this evidence and just say, hey, you know, since there's no opposition, putting aside for a moment those items that haven't been produced yet, there's so much evidence here that there's just only one way the District Court can go, and therefore we're going to send it right back to the State Court. That's really what you're asking us to do, isn't it? Yes, Your Honor. And that's precisely what the Liberton panel did. And, of course – We did? No, I'm teasing. I know this. I think you're familiar with that case. Judge Smith and I are both very familiar with that case. I'm sure you are, and I'm sure Judge Berzon is familiar with it, too, as I am from having read it. But it was not just what you did in the Liberton case, but it was the correct thing to do in the Liberton case. And in the Liberton case, there was no evidentiary hearing in either the State Court or the Federal Court. And this Court, if I may, two members of this panel, based on an expanded record that included all of Mr. Liberton's exhibits except for one, the Norton affidavit, on the basis of that substantial body of exhibits did precisely what we're asking you to do in this case. And as I recall, in Liberton, we were dealing with an AEDPA deference question as to the State Court as well. That's right. Which were not here because of the procedural default that was found, I think erroneously in this case. You were dealing with an AEDPA deference issue. You were also dealing with a 2254E2 issue in that case involving whether or not some of those exhibits that had been presented to State Court were properly developed in Federal Court. And those issues are not in this case. Okay. Okay. Now, we've delayed you maybe long enough. Do you want to compare what was in front of the trial court at sentencing to what now is in front of the district court? I would like to take another minute to answer Judge Smith's question, and then I would like to get back to Judge Berthin's question. Thank you. In Mr. Jayne's case, as one of you just pointed out a moment ago, the district court gave full consideration, footnote 71, or footnote 13, or whatever, on page 71, I'm not sure, near the end of the opinion, and said, we've considered every bit of the evidence that you've presented. There's no question that the exhibits that are before the court today in our ER were fully considered by the district court. So the record has been expanded. And the district court thoroughly discounted what was in the record, right? It kind of went through and commented why it didn't agree that it was a mitigating factor, et cetera. That's right. And I'd like to get to that later, too, if we have time. I'm sorry. One more question related to the evidentiary hearing. Sure. Is it your understanding that if we granted an evidentiary hearing, the discovery would come along with it? In other words, what I'm trying to understand is, I mean, one reason to grant an evidentiary hearing, despite the fact that there's no concept in the record, is that we might think the current record isn't dispositive, but that some of the things that you asked for in discovery might be. But you haven't exactly appealed the discovery orders. You appealed the failure to have an evidentiary hearing. Is it your understanding that two or one, that if you had an evidentiary hearing, that you'd get the discovery? You're correct, Your Honor. It's our assumption that if there were an evidentiary hearing, and we hope that, as I said earlier, there is not, that we would be certainly requesting the discovery that we requested in the district court. And you don't think that Judge Wake would simply say, I've already decided you're not getting that, Perry, at the end? Because you haven't appealed it as such? I have all the respect in the world for Judge Wake's integrity, and I think he would decide that question, saying, well, okay, if you have your evidentiary hearing and I was wrong on that, I'll give you the discovery you're requesting. The State, in its own brief, stated that an evidentiary hearing is not necessary in this case. And in pointing to the Landrigan decision, we actually agree with the State on this point. Landrigan is not a one-way street. If, as Judge Berzon said, the evidence is clear, and in this case it's overwhelming evidence of mitigation, there's no need for an evidentiary hearing. Under Townsend, which is still good law in DEDPA, an evidentiary hearing is only required if the facts are in dispute. And the State's had many opportunities in both state court and federal court to dispute any of the facts in our penalty phase IAC claim, and they failed to do so. Now I'd like to get back to Judge Berzon's question. Okay. With regard to what was already before the court, as opposed to what Mr. Pillinger presented, and by the way, what Mr. Pillinger presented was virtually nothing. But just looking at the pre-sentence report and other smidges of information that were in the record, the district court was clearly wrong. If you divide our federal habeas exhibits, our mitigation exhibits, into categories, it's easy to see what wasn't before the court. And let's start with Mr. James' horrific pre-adoption childhood. The sentencing judge knew absolutely nothing about the serious mental illness permeating Stephen's family, about Stephen's biological father injecting heroin in front of the children, about the rampant sexual abuse of several children in the family, much of it occurring in front of other children, that this sexual abuse was tolerated by both of Stephen's biological parents, that his biological mother left the children at home alone much of the time, that the children were often without food, and by the way, they were often without food because Stephen's biological father would spend the And the question is whether you needed some evidence to counter it that you didn't put into the record. Well, fine, but it was all over when he was four and a half years old, and he had every opportunity after that, so it's not really the kind of mitigation that would have been compelling. And I suppose that one could respond to that by saying, you know, a hundred years of psychotherapy, psychological research has demonstrated otherwise, but you don't have any of that in the record. Well, actually, we did cite studies that were available in 1982, Your Honor, in the district court. We cited, and I think we do in our opening brief here as well, studies that were available, and it's The answer is simply what you just said. You have a hundred years of research that overwhelmingly shows that the most important years in a person's life, in terms of predicting what type of a person they become as an adult, are the first few years of their life. We've all read the record. We've all read this material, which was well-presented by both sides. It would actually be helpful to me if you did the converse of what you're doing, which is to tell me what the jury did know, what the sentencing judge and or jury knew, as opposed to what was not known. Okay. Because there's a whole bunch of information you go through in terms of what was not known. I think it would probably highlight what we're dealing with here is to indicate what was known, what was in the record, what was considered. Thank you. Yes. Let's take the categories I'm about to go through, and this will shorten it considerably, and I appreciate that. First, it'll shorten it because it wasn't very much known. With regard to pre-adoption childhood, Winnie James testified at the combined hearing on the motion for a new trial and mitigation, and she may have been the only witness at that hearing that was only a mitigation witness. She was pretty much like the mother in the pinhole case. I mean, I think you're familiar with that one, too. Yes. And basically, what she said about the pre-adoption childhood is that Stephen knew that he had been rejected. There's nothing unremarkable about that. I mean, for a four-and-a-half-year-old kid who was adopted at age four-and-a-half, and she thought, she speculated that he had lived in foster homes. That's the only information other than in the pre-sentence report, Mr. James, Stephen, told the pre-sentence writer that he had recently gone to California and he'd learned that his father was a drug addict and been to prison. So basically, in the social media, that's all that was known at that point, which would be totally unexceptional. I mean, there's unfortunately thousands and thousands of young people who grow up in situations like that. That's correct. So all of the other information that you've talked about, which might be humanizing, was not known. Not only humanizing, but if you look at Dr. Potts' affidavit, it actually explains a good part of the reason for his hard mental state at the time of the offense. The second category is Mr. James' miserable post-adoption childhood. And we presented, as you know, quite a bit of evidence with regard to that as well. Now, what did the sentencing judge know about that? Well, there was basically the pre-sentence report, which described this environment as a stable, secure environment with loving parents. And I don't have any doubt at all that Winnie James was a loving parent. But there was nothing about any of the information about the difficult time, the traumatic childhood that he had. And in fact, what the judge had about this period was Winnie James' testimony at the combined hearing. When Pillinger asked her about drug abuse, she said, well, I don't know anything about drug abuse. So what little there was in the pre-sentence report about drug abuse was actually just undermined, totally undermined by her testimony. So the court had exactly the wrong information with regard to this Another important category of our mitigation evidence is mental illness. And if you look at mental illness evidence, there was a substantial amount of information that came up during that hearing with regard to the motion for a new trial. But it was buried in 300 pages of record. It was never mentioned by Mr. Pillinger as mitigation. And third, it was never understood by the sentencing judge as mitigation. A salient feature in this case is to actually read the judge's sentencing decision. It's called a special verdict in Arizona. And he went through all the, he went through aggravating factors and mitigating factors. And when he got to mitigation, he talked about the first statutory mitigator in Arizona, which is the model penal code test, impaired capacity to appreciate the wrongfulness of conduct or conform it to the requirements of the law. And he discussed it only in terms of drugs. He said, well, the defendant made some uncorroborated statements about his drug use and his intoxication and that wasn't proved. He never even mentioned mental illness. And that was short-term drug use as opposed to long-term. Exactly right. And long-term drug abuse never came up. And the short-term drug abuse was not mentioned by Mr. Pillinger in part, I think, because I think it was inconsistent with his defense of duress. At least that was his theory. And it was to some degree inconsistent with the facts of immediately surrounding the crime where James drives the car this long to stop by a police officer. I think that's a fair point. Plus, I mean, the other thing that struck me about this is that while people showed up later to testify about, to say that there was a lot of drug use around the time of the crime, whether they would have said it in 1982 is a separate question, right? It is a separate question, Your Honor, but I disagree that it was just people showing up later. In the record, and we have in the record, Mr. Norton, Martin Norton's Well, it was a statement beforehand, but by the time it got to the trial, he said otherwise. Well, the prosecutor was certainly not going to emphasize in trial that Mr. James may have been under the influence of alcohol or drugs. And Pillinger explicitly did not want Mr. James to testify about his drug use. So it never came up at the trial. But if you look at the pretrial deposition of Daniel McIntosh and the pretrial tape-recorded statement of Martin Norton, there's no question at all that this is not things that surfaced years later, that they were saying at the time in December of 1981, several months before the The point is not so much that he was acutely intoxicated so that when he was pulled over, he would be seen by a law enforcement officer as under the influence. But it is the very point that you were making, Judge Smith, the idea that the long-term drug abuse affected judgment, ability to make the kind of moral decisions that we want citizens to be able to make in our society. It's also true that at this point, his lawyer was quite specific about having made a strategic decision with regard to the guilt phase. It could have been changed to the penalty phase, but it wasn't. But with regard to the guilt phase, it seems to me that you have a hard road to hoe with regard to finding a strickling problem. We have not sought a COA on the guilt phase IAC claim. Yes, but if in fact that decision was not challengeable with regard to the guilt phase, then I understand that you have different decision makers, but they would have had to change the story at that point. Well, it wouldn't be changing the story. Mr. James, in his testimony of the guilt phase, just didn't mention any drugs or alcohol. There was just a brief mention of it in Martin No one would have to change their version of what occurred. If Tillinger had, with the one expert he used, Dr. Tuckler, if he had given Dr. Tuckler the transcript of Norton's pretrial statement, of McIntosh's pretrial statement, Dr. Tuckler would have had more than just the uncorroborated statements of Mr. James himself on that point. Dr. Potts did not testify, right? I'm sorry. Dr. Potts did testify, but as he says in his affidavit, I think it's on pages 461 to 465 of our ER, Dr. Potts testified solely on the question of the effect of lithium on Mr. James's ability for the jury to see Mr. James, what he was really like. Kind of a Riggins-type claim, and not a claim that he was never asked a single question about Mr. James's mental state at the time. The reason I ask that is because on ER 463 to ER, I have notes that Potts wrote, the preliminary information I reviewed reveals that Mr. James's ability to appreciate the wrongfulness of his conduct or conform to his conduct, the requirements of law in 1981, was greatly affected by his mental disorder, acute intoxication, chronic drug abuse, and family background related to his upbringing and genetic overlay. I just wanted to find out, did that ever get into evidence at the time of the penalty? No. This was presented to the state court in 1995. When we went back to the state court and said, you screwed up in 85. We need you to not cede evidentiary development to the federal court, and here's this affidavit, which in itself, in a case in which no mitigating factors were established, this affidavit and that paragraph of that affidavit, Judge Smith, it sums up the argument and it establishes a statutory mitigating factor in Arizona. Keep in mind also the procedural history of this case. The trial judge not only found that filandry proved no mitigation, but the trial judge at the same time found two aggravating factors, one of which was set aside by the Arizona Supreme Court as inconsistent with the jury verdict, and therefore, he was acquitted on that factor. It couldn't be proved beyond a reasonable doubt. What role, if any, does the fact that the state offered James a deal of 25 years to life play, in terms of whatever you want to call it, mitigation, something the judge ought to consider? Is there any role at all for that, in terms of whether there should be a death penalty? It's our position that death penalty is an important factor, and we would cite the Enbank decision in Summerlin where the court made just that point. They said that if the state itself takes the death penalty off the table in a pretrial plea offer, that's an indication itself that the state itself doesn't consider aggravation to be overwhelming. Well, maybe, or maybe it's just to hedge against the fact that he was, had some defense to the guilt phase. I mean, it was, in other words, it doesn't demonstrate that they thought that if he was convicted, he shouldn't get a death penalty. Well, it demonstrates that they didn't see it as inevitably a death penalty case. Well, they see it as inevitable conviction. Well, I think the language in the Summerlin case, Your Honor, is that they didn't see it as inevitably a death penalty case, and a panel decision in Scott. I don't remember what the facts in Summerlin were about the likelihood of conviction, but here there was at least some possibility that he would convince the jury of his story that he wasn't really responsible. Well, his defense at trial was a duress defense, Your Honor, and it's kind of like first-year criminal law that duress is not a defense to a homicide charge. But that's not, we're not raising that claim yet. I had another question, which was, oh, yes. Was the plea before the sentencing judge? Before the sentencing judge? Yes. No, Your Honor. Sentencing judge, there's nothing in the record indicating that. That he knew about, that there had been a plea offer. That's right. I want to come back to Dr. Potts for just a minute. In the testimony that Dr. Potts gave during that kind of odd combined new trial motion and penalty phase, as I recall, he testified as to lithium, both as to competence to stand trial and to affect in front of the jury. And then there was an objection when he was questioned about deeper issues of mental state. That's correct, Your Honor. So not only did he not testify, there was an objection, I think, by Pillinger. By Pillinger. That's correct, Your Honor. Yeah. That's correct. My time is up. Just to, well, I'll finish up in five minutes at the end, but thank you. Okay. We'll hear from the state, but we will give you a chance to respond. Thank you very much. May it please the Court, Counsel, my name is Kemp Katani, representing respondents in this matter. I would like to first very briefly clarify the state's position regarding procedural default. Then I would also like to explain why, even assuming there's no procedural default, why I don't think de novo review is necessarily appropriate. And then, third, I would like to explain why I don't believe Mr. James is entitled to relief under any standard of review, including de novo. First, very briefly, procedural bar. I don't disagree that the ruling in the first PCR is a rule that's not regularly applied. That was a, at the time defendants were, could raise ineffective assistance on direct appeal. As the district court pointed out, other courts have allowed a defendant to raise it in a subsequent post-conviction. However, in the third post-conviction proceeding, and the ruling is at ER 132, the judge specifically found a procedural bar under Rule 32.2A3 of the Rules of Criminal Procedure, based on the failure to have developed this claim in the second PCR. Mr. James raised it, checked the boxes, saying he was raising a claim of ineffective assistance, but then did not develop it. Counsel, in fact, argued- But at that point he'd already been held on the first PCR to have waived? That's correct. But he then, he certainly, he raised it and he checked the box, but he didn't make any claims as to what could have been done. Essentially he was preserving his, as sometimes happens, he was preserving his ability to challenge the procedural bar, but why go ahead and say it all again? He was told there were no issues. Well, I think he tried to get, you know, in the third one he does try to raise it. Yeah, in an excess of caution. But once having been told that he had to do it on the direct appeal or nothing, then why does he need to keep, have to be faulted for having passed on it? What I'm suggesting is there is, it is a separate ruling saying that he could have raised it. The trial court found in the third one that he could have raised it. In the second one he could have attached affidavits. He could have attempted to make a tolerable claim there. What I'm wondering is this. It doesn't seem logical, but that doesn't mean it's, so that leads to kind of a theoretical question of they said that, but we know he was already barred. Can they make up a procedural bar that seems so transparently implausible when somebody has already been told that they in fact can't do this? Well, the only point I'm making is that he tried, he did, he checked a box, but then didn't do anything more than checking a box. I'm asking a slightly different question. Let's assume that I think that this can't be right. But they did say it. In the third order they did say it. Now, do we say that it's simply not an adequate procedural bar because he'd already been told? Or what? I mean, how do we theoretically deal with a procedural, an asserted procedural bar that seems to contradict another state ruling in the same case? Well, I think other than to say what the court found there, that he did, that he waived an opportunity in the second PCR survey. But we should just check it because I said it, and it doesn't matter whether it does seem impossible. Well, I think it is plausible to raise, certainly to make the effort to raise the claim and to try to assert a colorable claim. But I'd like to address why, assuming the procedural bar was not appropriate, why de novo review is not necessarily the correct approach. And it's because this case is governed by the AEDPA, and we don't do away with the diligence requirement, and we don't do away with the requirements under 2254E2. And under 2254E2, if you haven't presented the evidence to the state court, you're only entitled to an evidentiary hearing if the evidence is such that taken as true, no reasonable fact finder would have found you guilty of the underlying offense and presumably would have sentenced you to death. There's still a deferential standard of review for consideration of evidence that was not presented to the state court. So you're arguing that they weren't diligent? Well, 2254E2 applies even assuming diligence. First, there's the diligence requirement. Assuming the diligence requirement has been met, 2254E2 requires both diligence and then the exact language is the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, a reasonable fact finder would have found the applicant guilty of the underlying offense. So it's still that provision assumes that the applicant has already established diligence. So from my perspective, there's still a measure of deference owed What is that? What are you contending? I'm suggesting it's like the Jackson standard, that if any reasonable fact finder could have considered that. You're saying basically if anybody could have found this was acceptable, that's worth the defense of that a lot. I think what 2254E2 does require that the evidence be considered in that light. Well, you know, you added something to the statute. The statute speaks about guilt. We're not talking about guilt. Right. And I apologize, I haven't looked. My understanding was that the principle has been applied in the context of sentencing as well. But you're right. The statute simply says that you're only entitled to an evidentiary hearing under those set of circumstances. But I think it's clear that... It's really quite different here at the penalty phase. I guess what I'm struggling with, I appreciate the fact that the state's done a lot of work on this, as they do with any capital case, and that evidence was presented, but what we're wrestling with here is the fact that by any measure, some very, very important mitigating factors were never brought to the Court's attention. So the question is, what do we... Does it reach the prejudice standard under Strickland? If not, why not? And what I'd be interested in from you, given your view of AEDPA, what is the standard? What deference do we owe to the judge in this case? Speaking specifically, I suppose, really both to the district judge and I suppose even back to the trial judge originally. I think the deference is just in the consideration of evidence that was never presented to the state court. To the extent there was... I would agree that assuming there's no procedural bar and there's no ruling on the merits, then there's a de novo review of what was before the state court. But I think there's something different with regard to the evidence that was not presented to the state court, and I think you have to consider that evidence. But, you know, let me interrupt if I can. I'll go back to Liberton, but Liberton is only one example of this. Liberton was a case in which we were dealing with essentially the same question, ineffective assistance of counsel alleged with respect to the penalty phase, and that was under AEDPA. That is to say, there had been a prior consideration, so in a sense the review was less favorable to Liberton on the standard than it is here. But we didn't do a Jackson standard. We did, is there a reasonable probability that the fact writer would have come to a different decision with respect to the penalty, and then applied the layer of deference to that. But the underlying standard in Liberton was not the standard you're asking for. And I apologize. I don't recall specifically in Liberton whether the evidence had been presented. Well, some of it had. Some of it hadn't. It was a classic case. That is to say, the argument was only a limited amount had been presented at trial to the sentencer, and now we know a lot more. I mean, in that sense, Liberton was procedurally on all fours with this case. Well, there was a difference. My recollection of Liberton was the argument was that the state court should have granted an evidentiary hearing based on what the state court denied an evidentiary hearing, denied requests for funding. That's my recollection. And the argument was there was sufficient material in front of the state court. That's the post-conviction ruling was incorrect. Yes, that's right. But what I'm saying is you're asking essentially for a Jackson standard with respect to the penalty phase evidence, even though in Liberton, which is an EDBA case, but it's procedurally in the same sense. I mean, that's to say the argument was there was a lot of evidence that was available that was not discovered and, of course, then not presented to the state sentencing judge. We now know. Well, the underlying standard that's applied to that question is, is there a reasonable probability under Strickland prejudice that if the fact finder had known this additional information, the fact finder would have decided differently. And that was the standard that we applied in reviewing what was in front of us with the layer of EDBA deference attached to it. It was not a Jackson standard. And, indeed, it really gets down to a point, I think, of if the evidence was not presented, unless it clearly was a strategic decision on the part of the attorney, whether or not the defendant can make out a colorable claim based upon what would have been presented. Do you disagree with that? Whether it's presented. When you look at the sentencing phase here, you've got a whole bunch of evidence that was not presented here. Right. Okay? The state's position is, in effect, hey, too bad. That's their choice. They didn't put it in. It's really not a big deal. The defense, on the other hand, says, wait a minute. This gets to the very essence of who this guy was, what motivated him, his background. It's something the sentencer really needed to know. But instead of a Jackson standard where the jury has been presented something and the question is whether any reasonable juror could have found the same way, here you don't have evidence, and so you have to determine whether, since it wasn't presented, whether a colorable claim is made or can be made by what new evidence is put before us. Do you disagree with that analysis? Not necessarily. I disagree with kind of the portrayal where it's not the position, kind of too bad they didn't do something. Why don't you characterize it as you think it should be? I'd be interested in that. Well, I think what we're looking at is the prejudice prong of the Strickland analysis. And so it's a question of would this new information have changed the outcome of sentencing or call that into question. And do you agree, do you not, that the Supreme Court's been very clear, our court's been very clear, that capital cases are different. People who are executed aren't here anymore. We can't correct anything. So all of these elements that I think the Supreme Court uses the term humanized, Williams or Rompia, one of those cases, I think Justice O'Connor used the term humanizing, are that they need to be brought before the sentencing body, whether it's a judge or a jury. And here all that didn't happen. So I guess what I'm looking for from the state's perspective is what is the standard that we apply here as to the evidence that was not presented? Do we look at it in terms of, well, if it were presented, it would present a colorable claim that might have affected the sentencing. Is that what we're looking at or is it something different? Well, I'm reading 2254E2 as having some significance that- It's not even E2, it's B is the one that you're allying on, right? Well, yeah, it's E2. But this is my question, or two questions. One is that is this a factual determination, in fact? The question of it's a counterfactual determination. I mean, the question of determining whether something is prejudicial, is that a fact? Well, I think it's- Is that a legal issue? I think it's probably a mixed question. Ultimately, it's a legal determination whether the prejudice- So I'm not sure it's covered by this 2B at all. Well, I think in terms of- Because E2 does go to evidence that was not before the state court, and how do we consider that? I understand that, but B just can't apply here because it's not about- It's about what a reasonable fact finder would have found. First of all, there's the guilty problem, but second of all, it's about a fact finder. It's about presenting facts, and here we're not- He said that the people who put in these affidavits that anything isn't true. Instead, it's a question of whether there would have been prejudice. That's how I'm reading E2. Certainly, if we're going to whether someone would have been found guilty, it's what E2 is saying, that these facts are such that this person would not have been found guilty. If I could, let me go into why I think under any- Let's assume there's a de novo standard of review. Can I just ask one other question, Jim, about the statute, just to get my head straight? We talk often about a diligence requirement. Is the only diligence requirement the one in E2A2? Was that the diligence requirement? That's my understanding. No other diligence requirement. That's correct. In our argument regarding diligence, we've never conceded diligence here. In Arizona, when you file, even with this- We haven't challenged it either. It seems to be off the table. I don't know that we- It's correct to say we haven't challenged it. We've said that under Arizona rules of procedure, when you file a post-conviction petition, you're supposed to attach affidavits to establish a colorable claim. And we've simply said here, even assuming diligence, he hasn't provided something else. We haven't challenged it, and it's a little late now. Let me move on to why I think- Let me back up and make sure I know what's on the table and not in front of me. The district judge did not hold there had been no diligence. The district judge said there were questions, but then went forward and simply said, I'm going to consider this new evidence. That's correct. Have you done anything in this court to argue that we should not consider this evidence on grounds of lack of diligence? I'm suggesting that you should consider E2, but we're assuming diligence. I asked you a very precise question. I will agree here that we're not challenging diligence here. We're saying, assuming diligence, that that's not enough, that there's still the added prompt. And you're not challenging diligence now? Right. Okay, got it. Let me move to why under a de novo standard of review, I don't think relief is appropriate here. There are essentially three categories of evidence. We have the intoxication and drug use. Second, mental impairment, some sort of mental health issue. And then third, the difficult childhood. With regard to the first one, the drug use and alcohol, I would like to go back to the third PCR. I think it's highly significant that in the third post-conviction proceeding, there was an allegation that Daniel McIntosh should have been allowed to testify regarding intoxication and drug use. I don't think that claim was found to be precluded. That was found to not have any merit. The argument was that the prosecutor, I believe, had threatened. The argument was that there was a suggestion that he was coerced or he was threatened with perjury if he made a different statement. So there was a suggestion that McIntosh should have been allowed to provide different testimony that went primarily to intoxication at the time of the offense, intoxication and drug use at the time of the offense. The state court found that that was simply not plausible, essentially not a colorable claim, given the evidence of Mr. James' involvement, his detailed recall of what had happened. What about long-term drug use, though? You're speaking of short-term drug use. What about the long-term drug use? It's kind of a different issue. I would like to get to that as part of the mental health evidence, if I could. And the quick answer to that is that type of evidence, along with mental health evidence, is not viewed to be as weighty, absent some connection to the crime. It's of diminished importance. With respect, counsel, I remember when I was riding a pinholster, I looked very carefully at Williams, Wiggins, and Rompilla, and Justice O'Connor went out of her way.  To point out how very critical the mental health of the defendant was, the family background, the drug use, all of that was an important element in the penalty phase. How can we discount that? I admit there are procedural issues here, but it sounds to me like the state is, in effect, saying, you know, it's not a big deal. It's in the PSR. We don't really need to worry about that. How can you do that in light of those three cases? Well, we're not discounting it altogether, but we're suggesting that, for example, when a crime, under the Arizona Supreme Court, under Arizona law, they've said that if, for example, a crime appears to be impulsive, then we're going to give more weight to these types of problems. But where it's a carefully planned out crime where it's not, where it doesn't appear to just be an impulsive act, it goes into the weighing process. For example, in penholstery, he had a frontal lobe injury that affected his judgment. He did all kinds of impulsive things, and yet that was something that was never presented. It's a mental aspect. It's a physical aspect. Admittedly, not in this case. But I'm just saying, those things are considered by the Supreme Court to be very important in capital sentencing issues. I don't disagree that they're not important. What I'm suggesting is it becomes more important if it's a crime that's impulsive. And I don't recall the specifics of penholster. But certainly in Arizona cases, the body of case law that we have, the Arizona Supreme Court has suggested that this type of evidence is more significant where it is a crime that's impulsive. So we're not discounting it altogether. But then it gets down to a question of weighing it as opposed to introducing it. That's right. And what I'm suggesting, and I'd like to go back to that first, this first category, this intoxication and drug use at the time of the offense. I mean, I think it's clear that the state post-conviction court did not buy that. And I think that's a finding that it's, obviously it's in a different, it's a separate claim from ineffective assistance. But that same finding goes to whether there's a credible showing that that type of evidence would have been compelling. And I think it's clear, certainly this third post-conviction proceeding, that new evidence of intoxication or drug use from Daniel McIntosh would not have been significant. And the reason it's not significant is because of the evidence that was presented at trial. With Mr. James driving a car, being pulled over by a police officer with apparently no suggestion of impairment. And one of the facts that's very unique in this case is Mr. James' own testimony. We don't, we rarely see the type of testimony we have here that shows complete recall of the event. I think if you read his testimony, it's clear that he had complete recollection. There's no suggestion that he was unaware of what was happening. Well, he seemed to have complete recollection of things that the jury didn't believe. I mean, he had a very detailed story that he seems to have made up. He did, although the details were entirely consistent with the story presented by Martin Norton. He just explained that I did it. I mean, depending what you thought he was intoxicated with. I mean, he says he took PCP and he says he took LSD and he says. Some of those drugs might impair his judgment but not his memory. Well, I think given the facts of the crime that don't suggest that there's anything impulsive about it, just how long it took and how the testimony seems pretty clear that James was the leader. I think the facts, in addition to his recall of the event, make it a very difficult claim to make. And as I say, the post-conviction court rejected alcohol or drug use testimony coming from McIntosh as a basis. The position with regard to the intoxication evidence is not that it was presented earlier but that it didn't matter. That it did not matter, it would not have changed things. The other category, the mental health evidence. I have to say that for me, and I'm speaking only for myself, the importance of the issue in favor of Mr. James is in exactly the reverse order in which you've done it. For me, the most important issue is the childhood. The next important issue that overlaps with childhood is mental illness. The least important is drugs. And if you'd like me to address childhood first. Just to let you know that don't skip the childhood. Right. And I think the mental health evidence is very similar to the intoxication because of the facts of the offense, because of his testimony. And I think what's very significant in this case, we don't really have any, even today, even with the benefit of new counsel in these proceedings, we don't have a diagnosis of a significant mental disease or defect. Wait a minute. We may not have, by your standards, a significant mental health. But whenever somebody is analyzed by a mental health professional, one of the first things they want to know is about the family history. And as I understand it from many citations in the record, on James's mother's side, there was a significant history of bipolar disease and schizophrenia. There are indications that James lost his temper very easily when he got intoxicated. He got mad very quickly, dramatic swings up and down. And he had a lot of depression and so on. Why isn't that important information that the penalty phase, the determiner should have known? I don't disagree that it's not important information. I think that information was before the sentencing court. What I'm suggesting, certainly that there was a mood disorder. And he'd been evaluated by- That was that little, I say little, because that's the way it was characterized by the judge. It was the psychothymia, I don't know what that is. It's treated as a mood disturbance. Right. But the family history, was that before the sentencing court? Well, the family history is the category that you're- the third category. I'm talking about the family mental health history. No, that was not- I don't think that was before the court. What about the suicide attempt? The several, many suicide attempts together, was that before the court? That was before the court, yes. That was the- I believe it's Mr. Ott, the correctional- What about the fact that he crashed his car at 120 miles an hour at several different times? I don't remember if that one was- The family, what they call suicides, what they call kind of- not an attempt, but a kind of display. And the jail was. But what about the fact that this was no- that he actually, I think more than once, run his car at 120 miles an hour to purposely kill himself? Yeah, and I've forgotten specifically when that information came out. And if I could get to this information- I have to say, I do remember it was not in front of the sentencing court. Yeah, I think- and I don't disagree with that. But that kind of- there aren't that many otherwise well people walking around the world who have that kind of a history. A lot of politicians. And I don't disagree, but we generally rely in these proceedings on- not just referring to federal habeas, but certainly in state court and here on expert testimony regarding a significant disease or defect. And it's noticeably absent in this record, but the two mental health experts, or actually three, counting Dr. Potts, at the time of sentencing did not diagnose this as a serious mental disease or defect. The only thing we really had was a mood disorder. But that's circular. If they didn't know all of this, then they didn't have the information on which to do it. Well, I think they did have the information. They certainly had an abundance of information at that point. And I guess what I'm- before I go to the- Not including these rather dramatic suicide attempts, not including the rather dramatic family mental health history. But what we have now is Dr. Potts, who really hasn't come up with something more than a mood disorder. And Dr. Potts is obviously familiar- Dr. Potts has had everything. And so this case is- when you look at these cases, there's generally- when there's viewed to be significant mental health evidence that hasn't been presented, there's usually some sort of expert testimony going to a significant mental disease or defect. And I guess the category that Judge Fletcher was referring to, the difficult childhood, my basic argument on that is that it is essentially cumulative to what was in the pre-sentence report. I don't disagree that- For goodness sake. The social history of the difficult childhood came from James himself, who says, I was adopted at an early age, and then he describes what a lovely home he grew up in after he was adopted. There was also information about a difficult relationship that the pre-sentence report does. The information available to the sentencer included evidence that his birth mother- that of drug abuse, the father- a criminal record by the father. It also includes that he had a difficult relationship with his adopted father. That part's very clear. That's right. There is a lot of evidence. Certainly it's not as fleshed out as you might expect or as is done now, but this was- the strategy at the time was to pitch him as a good candidate for rehabilitation. He only had one prior conviction for stealing $15 from his pastor. His mother was portraying him as someone who is- One of the problems there was that the lawyer represented the evidence inaccurately. It was very easy to prove that. She said that the prior probation officer said that he was a good candidate for rehabilitation. He didn't say that. In fact, when specifically asked, he said, no, I can't say that. But I think the best evidence was the relative lack of a criminal history. And, again, keep in mind you're also- you've had your client's testimony in rather exhausting detail. And so it's the choice that he made at the time, I think, in light of James' own testimony to pitch he had- But now you're talking about the first problem. I thought we were talking about prejudice. You're saying these were strategic choices that were made. I have to say, just so you know where I am on this one, I think there were very few strategic choices that were made. For me, the first prong of Strickland has fully been satisfied. And the only question I'm interested in under Strickland is prejudice. And where I'd really like to go with that is the fact that to the extent evidence is not cumulative, some of the evidence that would have been brought forward was a two-edged sword. If you had James' mother talking about his explosive temper or James' ex-wife talking about his explosive temper, that would not have helped his assertion that he wasn't the leader in this. And there's a little bit of irony here. The primary reason for granting relief to Liberton was this additional evidence, some of the same evidence that's been proffered here, for example, from James' ex-wife, that he essentially has an explosive temper that suggests that he was the leader. And certainly the ex-counsel, aren't you confusing the guilt phase as opposed to the penalty phase? I mean, the fact that he was or was not the leader would have been really important in that. But in this situation, you're asking the court to analyze this person to determine whether he's death penalty eligible. And all of these things that you are discounting, the Supreme Court has determined, are elements that need to be considered. Well, what I'm suggesting in Liberton, this court found that if you're a follower, that that is relevant, that that's something that could have been brought out. And all I'm suggesting is under Belmonte, you have to consider the evidence that would have come in. Had they put in this evidence, that it could help to a certain degree, but it also had the potential of harming you. And this is, to a certain extent, compelling evidence that James was the leader. This court found, essentially, in Liberton. You know, I don't quite want to say that. I wrote Liberton. It's very clear that Liberton was arguing representative evidence that James was the leader. I don't think we found that he was the leader. Right. But this court found that that evidence was significant. Well, sure, it was. If believed. Right. And what I'm suggesting is some of that is the same evidence, for example, James' ex-wife. That's some of the evidence that was relied on in Liberton. The assertion was that he should have proffered testimony from James' ex-wife. And all I'm suggesting is that there's a potential downside to doing that. And when you read, as Judge Wake points out, in reading Mrs. James' diary, it highlights some of James' negative qualities, that he stole from his parents, that if he had an explosive temper, it's heartbreaking to read her diary entries after trying to provide a good home from the time he was four and a half. And that wouldn't necessarily have been good. So what I'm suggesting there is when we analyze this evidence, we also have to analyze whether it could have changed the sentencing profile in a negative way. Can we address briefly the evidentiary hearing standard and your position on it? I mean, suppose we thought that there was a, that the evidence that was submitted was sufficient, if believed, as a basis for a grant. Or maybe we thought it wasn't quite for them, but there were discovery things that they asked for, like these California documents. I mean, you have not contested any of the evidence. Right, but I think that's different. I think what we've suggested is the evidence doesn't rise to the level of reading color. So is there any point in having an evidentiary hearing? Well, I think there is. How do I speak it? Or what would happen in an evidentiary hearing? What would be the point of it? Well, I think the point of an evidentiary hearing. Because we just decided the existing record. Right. I think the point of an evidentiary hearing, the State would obviously have a chance to cross-examine witnesses. And to the extent there's a witness who's providing something useful, it's very possible that that evidence, that there's parts that are not as useful. And so I don't think. But do you not have, I mean, I'm just thinking about this in terms of ordinary litigation. Ordinarily, if this was something like a summary judgment proceeding, and my question is, is it? If they put in these affidavits and you put in nothing to counter them, then that would be over and you wouldn't get to cross-examine people. You'd get, quote, summary judgment. So is that sort of the world we're in? Or is there some other reason in this context to have evidentiary hearings, even though there's no dispute in the evidence? Well, you know, I agree that we would certainly argue that it's summary judgment and that we don't think that it makes it colorable. But I just don't want to suggest that I'm conceding that we've necessarily, that we would accept all of the evidence. We're just not asked properly. I understand that's your position, but I want to understand the basis for your position. I mean, I've been puzzling out why it is in this context that we tend to at least consider ordering evidentiary hearings when we wouldn't do it if this were a summary judgment proceeding directly. Well, I think an evidentiary hearing would be an opportunity to develop, for the State to challenge the what would be the legal ground for it. If we thought this provided, on its face, a basis for, or a colorable basis or a sufficient basis, and we understand that you might be able to undermine it, but you haven't so far. Now, why would you get to do it now? Well, I think that's 2254E2. That's what's suggesting that you're assuming, that assumes diligence, and then E2 says that you're entitled to an evidentiary hearing if the facts are such that a reasonable fact finder. So that 2254E2. I think it's E2 that says that the belief is an evidentiary hearing and not a grant. That's the only thing I can think of standing right here. If we were to remand for evidentiary hearing, what would be your position with respect to a discovery request, for example, for the child services records in Los Angeles County? Should they be discoverable before we have the actual hearing? I guess the position that we've taken before is that, because there's already evidence of a horrific first four and a half years. That you apparently don't challenge. That's the premise for the argument you're just making. That's correct. Which was not the premise for the argument you made a moment ago. Well, yeah. If there is an evidentiary hearing, then I think it would change the dynamic a little bit. I don't know that we would oppose a request for discovery. It wouldn't make any difference if we found out that he was taken away from his mother because there was a child abuse in the home versus she gave him up because she couldn't see them. We don't really know why they were taken away. Well, I think we know the suggestion was that he was a difficult child, and I think the evidence before the court included evidence that he went to a different home initially where he was being treated. I'm going to ask you a specific question. Would it matter if the records demonstrated that the reason that this child was no longer in the home was because the child protective services people said that he was being abused and had to be taken out? We don't know that that isn't true. We don't know why he was taken out. And I guess the primary argument we would make, assuming I don't disagree, is that would be relevant. So I guess I would like to see that. The argument is you usually have to tie that in to rectory testimony. If you don't have an expert who's saying that this is how this results. The problem is that this all happened long ago and nobody had tried to find out what the circumstances were. I presume these documents would be pretty dispositive on that, and it's really bizarre that they weren't able to get him. To a certain extent, they're not as critical because we have the evidence from the birth mother herself. They were able to get affidavits from her, and certainly it's portrayed it. So back to the point, if you don't challenge that evidence from the birth mother? No, we don't challenge it. That's what she would say. We challenge the significance of it, obviously. Of course, she's deceased. The birth mother is deceased. But what I'm suggesting is that the evidence that he had a very horrific first four and a half years has been established. For example, there is some notion that he may have been sexually abused, but we don't know. And I think that was that. He has no memory of it, and there's no real suggestion. He doesn't remember it, but it was four years old. But I think he would need some. This is where we rely on expert testimony. I think it becomes without some suggestion, without someone else saying that he was sexually abused, that. . . Well, you could go and ask Chester the Molester. He's still alive, but you objected to that discovery, too. Well, I think there's usually some. . . And I think he's conceded that there really isn't much other than someone else in his household was abused. Someone else, basically, not just someone. Right. And I guess I think I've used up more time than allotted. I appreciate that. But, again, I guess I would highlight that this is different in that we don't have some compelling expert testimony. It usually is the vehicle that we have for linking some difficult childhood. When you've had this big separation from age four and a half on. . . And he was fortunate to be adopted by a very caring couple. And absent. . . It's usually linked to how is the crime one of impulse. And when you have this type of crime, the facts of this crime. . . And just one final point in terms of the aggravation. . . It is one aggravator, but here they did find it's essentially two different prongs. The state courts found both cruelty and heinousness and depravity. It was essentially a hate crime. And James subsequently bragged about it. So the court found, and certainly to the weight that's given, the fact that both prongs of the F6 aggravator were established is significant. Okay. Thank you. Thank you. Well, we took this date about ten minutes over. You can take us about ten minutes over. But you don't have to. I don't think I will. Okay. Say what you need to say. Thank you. Just quickly on de novo review, 2254D, as the court knows, is really a question of a case that's been decided on the merits. He's relying on E. Pardon? He's relying on E, not D. Okay. Yeah. On 2254E2, they have never contested. First of all, 2254D2E2 requires a petitioner seeking evidentiary development to demonstrate that he hasn't failed in state court to develop the facts under Williams. We went in great detail in demonstrating to the district court that Mr. James did not fail to develop the record in state court. The district court never challenged. It's interesting that it actually doesn't exactly say that, which is why I asked the question I asked you earlier. What it says is a factual project predicate that could not have been previously discovered. The problem here isn't discovery. It's that the state just didn't want to hear of it. Absolutely. As the Correll panel indicated in the first Correll case before the embanked decision, simply put, the state cannot successfully oppose a petitioner's request for a state court evidentiary hearing and then argue in federal court that the petitioner should be faulted for not succeeding. And that's exactly what happened in this case. The initial post-conviction relief counsel twice requested an evidentiary hearing. He sought from the county sheriff's office the jail records on mental illness, contacted witnesses to prepare them for testifying in an evidentiary hearing, and two weeks after filing his initial pleading, the state walked into court and said, Your Honor, don't consider the merits of this claim. Consider only the fact that it's procedurally defaulted because it wasn't raised on direct appeal. And a few weeks later, that's exactly what the trial judge did. I think it's the only remaining question that I have for you, Mr. Lowenthal. Kind of going back to what we did before is we've got these two different approaches. One is if your side prevails, number one is to send it back for an evidentiary hearing before the district court where both the state and you would have an opportunity to consider new evidence, the state's case, cross-examine, and the like, and the district court makes a determination there, or alternatively, as you recommended, that it simply be sent back to the state for resentencing. Were we to do the latter, how do you view any further discovery playing in? Would there be full rights of discovery in this state that would allow you to use the coercive powers of subpoenas and the like to present new evidence, or would you be better off in an evidentiary hearing? Your Honor, we definitely think that the better route is to not just reverse the district court, but to grant the writ on this claim and send it back to state court. There would be a full opportunity at a resentencing for both parties to conduct whatever investigation and discovery that they thought was appropriate and to present evidence. It's our position that the evidence we've already presented to the district court could just as easily be presented to the state court in a resentencing proceeding. Except presumably at that point you would have to have live bodies. Absolutely. And we still have live bodies. As Judge Fletcher correctly pointed out, the biological mother and the daughter. That's what I mean. You'd have to have an actual testimony. You wouldn't just have. Oh, absolutely. Yeah, absolutely. And go back to E-2, because I'm kind of fascinated with what this is all about. I mean, is what argument that E-2 just doesn't apply here, or is this your argument, It just doesn't apply at all because you didn't fail to develop a factual basis. They put it in or tried to put it in, and it wasn't taken, and that's the end of it. And E-2 just doesn't apply. E-2 applies when there's something new that wasn't done before, even though they could have. Yes, Your Honor. I think you've correctly stated our position. E-2 is just out of here. Yeah. And I think William is the case right on point. It just definitely says if you haven't failed to develop the record in state court, you're not precluded from developing it in federal court, and that's exactly what we're saying. Okay. Thank you. Any further questions from the bench? Thank you. Thank you. Well, I thank both of you for not only your arguments here today, but your extensive work on this case, briefing and development of the record and so on. We understand that these are very, very difficult cases for both sides, and we appreciate the hard work that both sides have put in on this case. James v. Schwerow is now to submit it for decision. Thank you.
judges: Fletcher W. , Berzon, Smith M.